Michael Codner on behalf of petitioners Anelilia Arenas De Garcia and Galacio Garcia. And I would respectfully request one minute for rebuttal. As your honors are very clear, the motion to reopen is a statutory construction unique to the field of immigration law under the Immigration and Nationality Act. After a threshold showing what the motion to reopen does is it allows the Board of Immigration of Appeals to remand to the fact finder, in this case the immigration judge, in order to examine after acquired material evidence relevant to removal proceedings. In this specific context, the relief proceedings. Now, while the grant or denial of a motion to reopen is generally a discretionary issue, which would invoke the potential problems of the jurisdictional bar under 8 U.S.C. 1252, there is case law within the circuit that suggests the court does retain jurisdiction to review that threshold determination for abuse of discretion. It is the case of Fernandez v. Gonzalez as applied to the record before this court, which I would submit both establishes jurisdiction before this court and why petitioners should prevail on the merits of the petition. As a primary note, I just want to direct the court's attention that Fernandez was decided after IHRA, which instituted the jurisdictional bar under 1252 and the Real ID Act. I think that that's relevant because the jurisdictional discussion in Fernandez obviously had to encompass these two jurisdictional issues, which are certainly raised by Respondent in determining and trying to have this petition dismissed for jurisdiction. I think the language from the Fernandez decision that where the relief sought is formally the same as previously denied, but the evidence submitted with the motion to reopen is directed at a different basis for providing the same relief, the circumstances can take it away from the jurisdictional bar of 1252. So how are the bases different? Because you were in both cases claiming exceptional and extreme hardship. And is it sufficient that it's to a different person or it's more severe hardship, or does it have to be a different person? I think that adequately sums up the issues in this case. I think that the language from that decision states as long as it is non-cumulative and directed at a different basis for relief, I think that the safety valve exception relied on by the court states that it is essentially a new application. So even if we have the same person, but it's at a different basis, I think that it does create different bases. Are you arguing both that the daughter's case justifies reopening and that the mother's case is? Correct, Your Honor. Well, the mother's case only involved matters that had occurred prior to the BIA decision, prior to the IJ decision even. Correct. So what's new about that? I understand, Your Honor. I think the relevant statutory, excuse me, the relevant regulation doesn't necessarily state that it has to be evidence that occurred after the decision of the board of the BIA. All that has to be is evidence that was not previously available. And I understand that the record is a little bit unclear as to why the mother's situation was not presented because it was before the board. But the point is, is that this was evidence relating to a hardship standard in terms of a life, a potential life-threatening condition of the cancerous, the precancerous condition. But was the evidence available at the time? I mean, at the time of the hearing before the IJ? Well, it does look as if we're looking at the dates of the evidence in the record, it does look like it existed by the time of the IJ. But the problem is, is that that's not what the board denied on. The board didn't even address that situation in the actual decision. It didn't even address the mother's condition. But you submitted it not within the period for the opening, but afterwards, in a supplemental brief, which might have been all right if you had any merit to it. But as Judge Wardle just said, everything you talked about, the hypertension, high cholesterol, and an abnormal pap smear, had been available. Now, you know, an abnormal pap smear is not the end of the world unless it turns into something. That pap smear was years ago. And really, it's hard to see any justification. I understand, Your Honor. So let's get to the daughter. We'll get to the daughter, absolutely. So the daughter did have something new. Yes, Your Honor. She had a keloid. Yes, it is a keloid, Your Honor. And what you said about the daughter was that she was sent off for consultation about the keloid. Correct. And then nothing more. Nothing more was ever given to the BIA, which gave them a reason to reopen. It would look to somebody as if when she had a consultation, probably nothing much happened. Because you had time before the denial of the reopening to say, here's what the consultation showed. Correct, Your Honor. But the mere fact that you're going for a consultation doesn't demonstrate that there's anything wrong. And you come back and said, we went, had a consultation, and the doctor says she needs an operation. That would be a far more persuasive argument than if you said she went to a consultation and then never said what happened in the consultation. I understand. And that was certainly echoed in the Board's decision. However, I think if we're looking at the fact that the evidence that was submitted, and like I said, we can only go by what's before the record. The evidence that was submitted suggested that there's a potential of a need for surgery. And I think that when we look at that in combination with the country condition evidence presented, this is the kind of hardship that is going to create a different basis for a different application for relief and is why the Board should not have acted like a fact finder in this situation. I think that the Board's role in this point is to look at the evidence and to see if it warrants reopening. It's a threshold determination. But the Board's decision was essentially based on a fact finder. They stated that it wasn't a life-threatening condition. The relevance of that was that it was a life-threatening condition. They don't know. I mean, you didn't show that it was life-threatening because you never told them what the consultation showed. All you said is she's got to go to a doctor. I understand, Your Honor. I understand. My reaction to what the Board's decision is, is if they'd had evidence of these things, I would certainly be bothered by their analysis that somebody they're deporting to Mexico, a young girl, could somehow make her way back to the United States and get an operation. Since we don't have health care, I don't know how she's supposed to pay for this operation. How is she supposed to get here? I mean, I think the Board's decision is highly questionable. But that would be if there were evidence that she needed an operation. Correct, Your Honor. And I think the issues that she cited, and I think that the extrapolation on the evidence that we've decided, that determination would be proper for the immigration judge, for it to be responded, for it to be remanded back to the immigration judge or to the HEN to conduct a fact-finding issue as to whether this hardship would be sufficient to show cancellation. The Board's position in this point is not to act as a fact-finder. And what they did is, is they imposed a new legal requirement, essentially requiring that this be a life-threatening condition. Now, I think that the Court's opinion in City v. INS states that if the Board is going to create a new legal requirement, it has to give proper notice. And there was nothing in this. Did you represent this family from the beginning? My office did, Your Honor, yes. I personally did not, but my office did so. Well, I won't ask you to tell us, but I would assume if you're a competent office and that the consultation had showed that you had a real problem, that you would have advised the Board. Correct, Your Honor. And I can represent to the Court that this office, that our office did everything in terms of diligence in obtaining the future consultation and the types of evidence that you required. It's an obvious implication based on reading this evidence. Yeah, but you missed time limits. Excuse me, Your Honor? You missed time limits. In terms of obtaining that information and then presenting it to the Court? Yeah. Correct. Presenting it timely. That is true, Your Honor. However, I would state that this evidence does suggest that there's at least a more than likely possibility that she is going to have to have this surgery and submit it in conjunction with the country condition evidence. Do you have a picture of this? No, we do not, Your Honor. No, we do not, Your Honor. But I do, I can state that based on the evidence that does... How could a keloid be a life-threatening condition? Well, that's certainly one of the dispositive issues at this point. The fact is that she's, if we are to assume the fact that she's going to have to get... A keloid is when you have a wound that heals and it's raised. Uh-huh. The... Yeah. Correct. Some people have a keloid, other people don't. If we're to assume that she has to have surgical, assuming for a second that she has the surgical intervention, she's going to have to go under anesthesia, she's going to have to do this in Mexico. And if we look at the actual condition of the country condition evidence in terms of the Mexican health care system, I think that is where the potential life-threatening problems come in. Well, the evidence here is there's a fair number of places to get this done in Mexico that are safe. That there are also clinics that are unsafe, like lawyers here, who come on immigration cases. I'm serious about that. Yeah. You know, maybe 10% are competent. 90% don't even have licenses. They're notarios. And probably, how did this woman get to... And they're just barred. How did she get to immigration? Why? There was no reason for her to go. Somebody, pretending to be a lawyer, told her, go to these kindly people, and they will give you... You can become a permanent residence. And there was no chance. So she got deported because she listened to a lawyer. Well, that's the way a substantial percentage of the immigration bar is in this country. And that's the way the clinics are in Mexico, according to her evidence. But there still are places, a substantial number of clinics where she could go. But your first point, that they're wrong in saying it has to be a life-threatening condition, may be correct. But maybe it doesn't have to be a life-threatening condition. Maybe she just needs an operation. But there's nothing that shows she needs an operation. There's nothing that shows she needs anything. All we know is she went to a doctor. Well, you know, yeah. These folks, this family, went to your law firm initially. Is that right? Correct, Your Honor. Well, who gave them this bad advice? The bad advice to... To go to immigration. To go to immigration. That I cannot answer that way. I did not represent either of these Petitioners at the original immigration court level. Are you stating in terms of they entered... Well, this case started because she was living a happy life here. Her daughter was happy with a keloid. Everyone had a happy family in the United States. Somebody sent them to see your friendly government. Go see immigration, somebody said. For what? And who did that? Was that your firm? I do not believe so, Your Honor. I've been with my firm for the last six years. And that's a very, very rare consequence that they're ever entered voluntarily into immigration proceedings. And that's what the court is inquiring on. Yes, that's what, at least, yeah. Somebody sent them to immigration. That's how this case started. They went to immigration and said, look, we really like this country. We're good residents of this country. We're having a productive life. We've got children. And now will you give us permanent resident status? Well, they received notices to appear. Well, that was after they showed up. Somebody gave them, they wanted to legalize their status. And they go see a lawyer. Correct. And the lawyer will say, oh, well, we'll file for political asylum for you from Mexico. Or just file an application for suspension of removal. And then that calls their existence to the attention of the authorities. And then they come after them. Otherwise, they never would have found out about them. I think they're buying a house. They're working. The kids go to school. They all go to church. They do community service. They're ideal inhabitants of this land. And this goes on all the time. I'm very familiar with the type of practice in immigration law that you're discussing, Your Honor. Are you a partner in this law firm? No, I'm not, Your Honor. You don't seem like the kind of lawyer who does. You're really the most articulate immigration lawyer that I've had the honor of listening to. Thank you, Your Honor. Yeah, but you're not doing your client any good. I understand, Your Honor. I mean, maybe they'll feel better. And if I may, it is an acceptance. You look good. You speak well, you know. Thank you. You're probably getting ready to run for senator. If I may, it is an acceptance. I can submit to the court this. If clients come in in the situation they have not been encountered by immigration and the client asks, how is there a way for us to obtain our papers? If the immigration lawyer looks at the situation and sees that they meet at least the threshold prerequisites for cancellation, they've been here for 10 years, they have no disqualifying convictions, and they do have family, extensive family members here, that is essentially going under the four requirements of 248b-1. Yeah, but that's rarely granted. You know that. Well, I can say this. Especially for Mexican citizens. Understood. And that's very, very true. But there has been immigration judges, and I'm not defending this practice, but I'm trying to explain probably the basis as to why this may have happened. I don't have personal knowledge of it, but there have been immigration judges that simply approve the applications based on familial hardship in terms of separation. They've been here past their tender ages, have been immersed in, and separating from that system is enough for some immigration judges. So while it's ‑‑ Yeah, but they're few and far between. They get fired after a while. That's not what the statute says, clearly. Extraordinary and unusual hardship. Exceptional. Exceptional, extraordinary, unusual. They put in every adjective they can think of. Correct. There's no ‑‑ the problem with that is there's no statutory definition of that. You don't need much of a definition. I mean, you pick words that have a meaning. Extraordinary, unusual, exceptional. That doesn't mean anybody who's been here 10 years and happens to have relatives. It's got to be that kind of a hardship to the relative. And anybody who tells somebody who's having a wholesome, productive life in this country, well, we're going to take you to immigration. It's your family government. Understood, Your Honor. Doesn't know the plain meaning of the language of the statute. I understand, Your Honor. I think that that's a ‑‑ Well, you understand. I hope the other people in your family understand. I'm certainly one to question the validity of that type of practice, to be honest with you, because immigration law is a little bit of a conundrum. At one point we have a family living here illegally and breaking the laws of the United States and technically could be prosecuted for that. Or we have a chance to forego that prosecution and potentially ‑‑ They're not going to be prosecuted for it unless they break other laws. If they're just living here like millions of others and they're living wholesome, productive lives, to bring them to the immigration authorities and say, we'd like you not to deport us shows a lack of practical understanding or an inability to read the statute. Correct, Your Honor. Respectfully, I do practice before the district court, before the southern district, and the immigration prosecutions for illegal reentry or presence here are increasing. And I don't know if that belays the court's concerns, but it's just all I'm trying to point is the immigration law is in a little bit of a conundrum in that respect. And like I said, while I don't condone essentially voluntarily turning a family that has essentially been, you know, the model American citizens into immigration, it's definitely one of those rare situations that requires the judgment call. Especially when you have people, if there's going to be any change in the immigration laws, it probably, you know, I could see the statute extending to people like this and putting them on, putting this family, these parents on the road to citizenship. I mean, the mothers of the parents, as I recall, are legal permanent residents. The kids are all born here. These people have got a sterling resume to present. And I don't know, just... Well, there was some hope with the new administration that there would be priorities given to deporting people with criminal records. And I think that maybe the Justice Department, if not Homeland Security, has some idea that the people that ought to be deported are the ones who commit offenses, not the ones like your clients who are leading productive lives. But whether that will ever come to being, I think Ted Ferguson is more optimistic than I am about the world in general. But whether it will come to being in this administration, nobody knows. Maybe your opponent can be as sure as... I understood, Your Honor. And I would see that I'm well past my time, so I resort... We'll give you a minute anyway. I'm a happy guy. You know, a big smile will take you a long way. Thank you, Your Honor. If not your clients. I do my best, Your Honor. Good morning, Your Honors. My name is Catherine Clark, appearing on behalf of the Attorney General. Fernandez does not establish jurisdiction here. Do you really want to deport these people? Would you be willing to go to arbitration and – not arbitration, I'm sorry – to mediation? You know, a fair number of our cases with your office go to mediation, some of them successfully. The – in this case, the Petitioner has not – the mediation would need to be preceded by a request for a joint motion to reopen or some other basis for that mediation, some ground for relief eligibility. And Petitioners have not shown relief eligibility here. What takes – what's necessary for relief eligibility? Under the cancellation standard, a showing of – because they've established the other prerequisites for cancellation, a showing of exceptional and extreme... Well, if they've established it, they don't need mediation. They just go ahead and beat you in the case and that's the end. Who needs mediation to ask both sides to be reasonable? I mean, mediation is in cases that, you know, it's not – they don't have an established right to win. The government does in mediation sometimes try to work out a way to let reason prevail. If there was an additional ground, if there were an additional ground of eligibility for relief here, such as a – pardon – such as an adjustment application on file. Well, what I'm just wondering about is they have four – I don't know how old the children are now, but they have four U.S. citizen children. Wouldn't – I don't know the law, and it certainly wasn't argued, but I'm just wondering about adjustment. The... And I don't know the status of the two mothers who are both lawful permanent residents, which means they are on the path to citizenship. To just back up for one moment, the – there are only two living U.S. citizen children, just two, just as a factual matter. The U.S. citizen children are 19 and 17. The parents who are lawful permanent residents in this case are unable to – I believe unable to petition for the married – the married petitioners in this case. You're talking about the grandparents. The children's grandparents. These – the individuals I'm speaking of now are the children's grandparents. Yeah, okay. Yes. And... Well, yeah. They can't petition, I guess, because the parents are too old now. That is one of the reasons, I believe, yes. And... But, you know, the mediation I think we've used in these cases, when it seems like a just or an equitable result. I know the children are 17 and 19, but that's only because the cases take so long. They were, what, about 11 and 13 when it started. So now if they wait another couple of years, they'll be adults, which isn't going to solve the problem of sending their parents back, which doesn't seem like it helps anybody. The petitioners – the parents live here, their children live here. What do we really accomplish by sending them back? The government's position is simply that mediation is not appropriate in cases where there's no relief available as a legal matter. There is no relief available here, no cancellation available, no adjustment of status available. No justice available. I would not want to comment one more time. No, I accept that. But, you know, things are changing. We have a wonderful person who's now in the Justice Department who's a deputy or an assistant attorney general who's in charge of these immigration matters. Used to be head of the BIA and oversaw that. So I know they're concerned about it. And this might be just a wonderful case for them to focus on coming up with some help for these people. And so they might welcome arbitration here. Mediation. Mediation. Absent versus in. And we'll be the mediators. Well, you could always go back and say to them that Judge Pegersen thinks they're wonderful people and that they might like to take advantage of this opportunity. And then we'll see. I tell you that Judge Pegersen's a little more optimistic about these matters than may be justified. But I can't do any harm to tell these new wonderful people that they have this opportunity. Due respect, they are aware of this, of the mediation option. And when the, when there is a basis for mediation, when there is a. . . Didn't we send a case to mediation just last week with someone from the DOJ where they were arguing, you know, that there was no basis? That young, attractive woman from the DOJ. You're the one I liked. The one you liked. She agreed to mediate. Did I hear that? Yeah. Yes. Oh, yeah, I remember that. I can claim no awareness of that particular case. That leads me to something else. I'm sure you're going to claim no awareness of this either, but we just received a 28-J letter from the Department of Justice in the case that is submitted, Carranza, in which the Justice Department takes back its argument that there was no jurisdiction because the statement in Fernandez was dicta, which is the argument you make here, and says we were wrong to make that argument in light of the May 2009 decision in Negretti. So we have a 28-J letter from your office that is saying we don't, we're not going to advance this argument any longer. We understand you've already ruled and you're making the very same argument here. And so it shows to me that someone's not talking to someone in that department. Even if the statement in Fernandez is not dicta here, there are a lot of other I didn't have a second factual argument, but what you argued in your brief, which your colleague at the Department of Justice acknowledged, was an erroneous legal argument. You should at least be able to acknowledge that as well. Are you aware of the case in Negretti? I am aware of Negretti. However, the reasons, I'm not aware of the individual case that you're speaking about that is not Negretti. It's another lawfully abiding Mexican citizen who, at an order of deportation and voluntary departure, under cancellation of renewal, which we submitted because she never responded to the notice for oral argument. It's virtually an identical claim. In fact, she might be the one with four children. It could be confusing. But the point is, that I'm trying to make is that it seems like the lawyers ought to talk to each other, especially when they have arguments on the same issues on the same day before the same court, before the same three-judge panel, and decide what their position is going to be. This was, I do not believe, an argument that was scheduled for today. However, the holding in Negretti still leaves intact the requirement that there is no jurisdiction if the, if over a determination that there is no crime-officiate case based on, based on a hardship determination. No, no. Because what it said is that that's the, the formal avenue of relief can be the same. That's why I was asking, opposing counsel the question about, okay, they're asking the same formal arguments being made, but they're saying that we have, you know, evidence of a different degree, which I tend to agree should have been presented. But also then we have new evidence of hardship to a different person. And so we would have jurisdiction over that one. Regarding the evidence of hardship to the mother, two issues there that may distinguish this from the other case that you're referring to. The. Well, the mother I think you don't have a problem with. Okay. The problem, the problem would be with the child. The court. The U.S. citizen child. The court in Fernandez in the statements that were argued to be dicta previously, even if they are not dicta, the court in Fernandez stated that when the agency considers all of the new previously unavailable evidence that is offered and its judgment about that evidence is still unreviewable. And that was with the citation to Prado versus Reno out of the First Circuit. But that was still part of the dicta of the, of the statement in Fernandez. Therefore, even if that is binding, it requires only that the agency consider all of the new previously unavailable evidence, which the board did here in its analysis of the motion to reopen it, it explicitly mentioned every piece of new previously unavailable evidence. So that, that is all the evidence related to the daughter. And therefore the court does not have jurisdiction over its assessment of that evidence. It simply has jurisdiction under Fernandez of whether the board did assess that evidence, which it did. Now, its judgment with respect to whether that evidence is sufficient is not reviewable, even under Fernandez. So the, whether or not that statement in Fernandez is dicta would be unavailing to Petitioner either way. We still have jurisdiction over this petition to review. Respectfully, the court does not have jurisdiction over the petition because of the, I think we're talking in circles. Yeah. I think the question, I don't think anyone disagrees with you that we couldn't say that the board's judgment is wrong about whether this constituted an extraordinary circumstance. We can't review the merits of that decision. We can't review any legal questions, such as, for example, if you knew that there was evidence coming from a doctor who was examining somebody and you cut off the opportunity to furnish you with evidence that would show that the person had a medical necessity to remain, that might be arbitrary in your procedures. Whether that applies here, where they had an opportunity to furnish you with the evidence and failed to, but let's say they told you that before the decision we have an appointment which will tell us whether the person's life is in danger and you just went ahead and issued the decision and wouldn't take additional evidence, then it's not a question of the merits, it's a question of the legal necessity to continue the procedure. So we can't say that the board's judgment is wrong, but we can't review any legal  somebody and you cut off the opportunity to furnish you with evidence that would show that the person had a medical necessity to remain, that might be arbitrary in your procedures. But that's just an example. Kennedy, for instance, you didn't consider in the denial of the mother's case whether you should have or not is another question, but there clearly they asked you to reopen on the basis of the mother's case, which may be a very weak case, but there is you never mentioned that in the denial of the reopening. It is not simply whether the mother's case is weak or not. I don't think that's a winning argument if I thought there were any merit to the mothers, or maybe even if I don't. If somebody says, please reopen, here is our argument, and you think the merit is not meritorious, you have to rule out the possibility that the mother's case is weak or not. So you don't have to rule on the request to reopen. You don't just ignore it. It would be like saying if you didn't have the daughter's case and they made a motion to reopen based on the mother's, that if you thought it was a nothing to it, you don't have to rule. Two responses regarding that. The mother's, the allegation regarding the mother that was part of the motion to reopen was also submitted well after the 90-day deadline for the motion to reopen, and that evidence was cumulative. The high cholesterol, high blood pressure. I don't disagree with any of that. All I said is when you ruled, you didn't mention it. So if you had said it's too late, it's cumulative, said anything like that, you clearly win. We couldn't review it. But you didn't say it's too late. You didn't say it's cumulative. You didn't say anything. There is a presumption in any case that the board considered evidence submitted, and the alien must overcome that presumption. That is this Court's holding in Laredo. And the presumption is not overcome where the evidence is not new, is not previously unavailable, and is not relevant because it is cumulative to the prior evidence with regard to the high cholesterol, the high blood pressure. All of these have been considered by the immigration judge, deemed not to constitute exceptional and extremely unusual hardship, adopted and affirmed by the board in a decision that was petitioned for review, and that petition was dismissed. So... I've got to say, I've never seen a case, maybe you can give us one, where I've seen lots of cases where they say it's cumulative, or there's nothing new, or there's no basis for it. I've never seen one where they just ignored the motion. Even if that was error here, that was harmless error. And the evidence is simply so blatantly cumulative, so blatantly previously unavailable, the dates on that, on those documents that they submitted state that they were, that they were, that those analyses were conducted in 2004, and then in October of 2005, where the proceedings before the IJ, the merits hearings, were in December of 2005. And the... So you're acknowledging you have jurisdiction to decide that? That there was error, but it's harmless? Whether, to decide whether there was. Right. That's all I've been trying to say, that we have jurisdiction over this. With respect to whether the court, whether the board considered the evidence, yes. Not with respect to what the board did, whether it did. No due process or legal claims. Yes, but Petitioner advances no due process claims. Well, but let me ask you this. There may be, and I wouldn't be surprised if there were, a claim here of ineffective assistance of counsel, the way this whole thing was handled, where people come, someone sent them over there, file this petition. We don't know the details. The time limits are missed, 90 days. You know, there's almost a presumption of ineffective assistance. I mean, that may be, and we don't know really what, what the true facts are. We don't know what this little girl's condition is. We know very little. We do know that these are, sound like good, solid people that are an asset to this country. But I don't feel comfortable with the representation that they received here. And this, to me, this just rings all kinds of alarm bells to me. Anyway, what did that great Yale law professor say, that in hell there will be no laws, but procedural due process will be strictly observed? The proper means for a certain... Must have been a Harvard. It must have been a Harvard professor, not Yale. No, he said this. He said, in heaven there will be no laws, and the lion will lie down with the lamb. In hell, there'll be nothing but laws, and procedural due process will be strictly followed. He was a Yale professor. He was an admiralty expert. I should remember his name. Last week you were out front Williston. Not Williston. Not Williston. No, anyway. Yeah, I remember that other young lady. That joint heart was not easy with her. I was holding her hand all the time. But you didn't get any help here. No, no, you're very nice. Thank you. As long as we're not the ones being deported. Anyway, there's a lot of things that I'm worried about in this case. I look a little bit more into it. Petitioners could... The proper means for asserting any ineffective assistance of counsel claim would be a motion to reopen before the board, and petitioners would not assert that. Maybe we ought to get one of these major law firms to take a look at this case. We've done that. But we thought, you know, we're here to administer justice. That's our first... That's what we're here for, not to worry about a lot of these little things that can trip people up along the road to achieving that. And if Congress does not provide a means for the individuals in this case to obtain lawful immigration status, the agency cannot do so itself. Don't blame Congress for everything. Why are you blaming Congress? Well, it's a combination. I like my Congressmen. You're still thinking of Jim Corman. Yeah. Who was the... One time, he's no longer there, but he was the floor leader of the 64 Civil Rights Bill that put, you know, discrimination on the basis of sex. It changed the whole country. Anyway, it's not irrelevant what Judge Ferguson's saying. There are two aspects to it. Number one is it's not just Congress. There is a prosecutorial discretion in the Justice Department, although they always blame it on Homeland Security. There is an order in which cases could be prosecuted. Deportation could be prioritized. And there are those, as Judge Ferguson said, in the Department of Justice who believe that these cases should be brought. When there is criminal activity, there are plenty of opportunities for that, and that those should be brought first, that not every person who wanders into the office should be deported if he's led a law-abiding life. You've got, what is it, 8 million unlawful aliens supposedly in the country. Now, is it more? You're not going to bring 8 million cases. So one option that those in the Justice Department favor is that you start with the ones who have committed crimes. So Congress isn't to blame for that, the order in which cases are brought. The second thing Judge Ferguson said is there's a possibility of having to go through a series of proceedings involving ineffective assistance of counsel, which might give reason for mediation to resolve all these matters and not spend another $10,000, $20,000, $100,000 of taxpayers' funds on trying to deport these two good, decent people. That is the legal hook which could be used in mediation to say that there's a reason to settle a case. So... And you know, well, we've got you here as a receptive audience. Not so receptive. A lot of these people are suffering because the Department of Justice knows, knows, and even I think maybe they've changed the rule, but allows disbarred lawyers to practice before it. And knows that in... Oh, I'll be conservative. At least in the cases that we look at, probably 50% of the people are represented by incompetent lawyers who take their money and do them nothing but harm.  And we're all complicit in it because we allow it to go on. You know, the Justice Department could stop it. Stop this kind of conduct that we've seen here, where people come in and they take their money. I don't know how much money they got. They probably got $2,000 or $3,000. Someone goes in there and they sit them down with a person who is not a lawyer and takes a few notes and then fills out an application and tells them everything's going to be fine or whatever and files it. And then the people, that's when their troubles start. Well, really this is... You know, we're all complicit in this. It's time for all of us to ask for forgiveness of our sins. Well, aside from that, forgiveness of our sins business, I just want to say that it's not the type of lawyers before us today that is responsible for these. We get cases all the time where we have briefs which are just copied. They're model briefs, one brief. They get the name of the party wrong. They get the name of the country wrong. They don't know what the issue is. They just grind it out, send it to us. And then the lawyer, because he's getting a flat fee of a couple of thousand dollars, when it comes on appeal, just says, no reason to appear. I'll submit the case. They don't want to take the time to show up for a hearing. That kind of representation we are trying to do something about now and to remove them from our roles at least. Some people never see a lawyer until they're before the IJ and somebody wanders around and maybe talks to them for two minutes and puts them on the stand. You know that goes on? It's going on right now, I'm sure, downtown L.A. Well, anyway, you can't do anything about that. You could let us know when you get back and find a sympathetic soul in the Justice Department that they would be willing to send this case to mediation. If you find such a person like the kind of person Judge Fagerson seems to know in the Justice Department, if you do, let us know and we'll be happy to do that. Thank you, Your Honor. Oh, I've got some law clerks that are working up there now. So maybe they'll find one of them. And maybe you won't. Maybe you won't. Thank you. All right. And that is submitted. Oh, you wanted one minute. No. When's the first time that you saw these people? I mean, you don't have to answer these questions. When did you first see these people? Yeah, you personally talked to them. Well, what I generally do is I wait for the reception of the record and then I speak it over with my boss as to the issues that are presented and then I wait for him to set up an appointment for us to sit down for previous work. Because I was on the trial counsel and I can't explain the unfortunately I can't give the answers that you're looking for in fact and why I was entered into it in that respect. Yeah. So that's my procedure. But I know I can compare the court and then I know the attorney. No, no, you look, you sound like a good person and an intelligent person. And a good lawyer. And a good lawyer, yeah. Yeah. I expect to see you as mayor someday. But, no, I'll vote for you. You want to vote for her? I might, yeah. Okay. Thank you very much. All right, we'll go to number three. U.S. versus Zimmerman. This is our DNA extraction case. Okay.
judges: Pregerson, Reinhardt, Wardlaw